### SOUTHERN RY. CO. v. O'DELL.

(Circuit Court of Appeals, Fourth Circuit. July 22, 1918.)

No. 1624.

1. MASTER AND SERVANT ⬥289(17)—SAFE PLACE TO WORK—NEGLIGENCE—QUESTION FOR JURY.

Relative to question of negligence of master as to furnishing safe place to work in allowing certain conditions to exist, conflicting evidence *held* to make it a question for the jury whether there was good reason for an electrician, repairing a motor, to stand where he did to make observations.

2. MASTER AND SERVANT ⬥288(15)—INJURY—ASSUMPTION OF RISK—PROMISE TO REPAIR.

A servant did not as matter of law assume risks of defects where he was working; the master on his complaint having promised to remedy them, and the evidence not being conclusive that his injury was so long thereafter that he must have abandoned hope of performance of promise.

3. APPEAL AND ERROR ⬥901—BURDEN OF SHOWING ERROR.

A case for injury to railroad employé, fairly tried on the merits, will not be reversed on refined distinctions between interstate and intrastate commerce, except on a clear conviction of error in the trial judge's view.

4. EVIDENCE ⬥29—JUDICIAL NOTICE—STATUTES OF STATES—FEDERAL COURTS.

Federal courts take judicial notice of the statutes of the states.

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Western District of South Carolina, at Greenville; Joseph T. Johnson, Judge.

Action by Clarence L. O'Dell, by his guardian ad litem, L. B. O'Dell, against the Southern Railway Company. Direction of verdict for defendant was refused (248 Fed. 345), and defendant brings error. Affirmed.

See, also, 248 Fed. 343.

T. P. Cothran, of Greenville, S. C. (Cothran, Dean & Cothran, of Greenville, S. C., on the brief), for plaintiff in error.

E. M. Blythe and J. J. McSwain, both of Greenville, S. C., for defendant in error.

Before KNAPP and WOODS, Circuit Judges, and SMITH, District Judge.

WOODS, Circuit Judge. The foot of C. L. O'Dell, an employé, was caught in the cogwheel of defendant's cinder carrier or crane at Asheville, N. C. For the resulting injury, O'Dell recovered a verdict for $14,000 on the allegation of negligence in furnishing an unsafe place to work by reason of these conditions: (1) Absence of electric lights at the carrier sufficient to obviate the necessity of the use of the torch held by the plaintiff in his hand; (2) absence of a guard for the inner gear of the carrier; (3) use of a framework on which the carrier ran, insecure by reason of vibration; (4) use of a controller of the carrier so out of repair that the application of the electric current caused a sudden, instead of a gradual, start of the carrier. The defenses were: (1) Denial of any negligence of the defendant; (2) averment that the injury was received while the plaintiff was engaged in interstate commerce, and that therefore there could be no recovery under the common law or statute law of North Carolina; (3) negligence of plaintiff as the sole proximate cause of the injury; (4) contributory negligence; (5) assumption of the risk of the employment. The trial court refused a motion to direct a verdict for the defendant, made on the ground that the evidence proved the defenses to the exclusion of any other reasonable inference.

These facts were not in dispute: At Asheville, N. C., a junctional point for both interstate and intrastate trains, the defendant kept a cinder pit, into which all engines emptied cinders. To dispose of and utilize the cinders after they had cooled in the pit, the defendant maintained a transverse section of track over the surface track on which was run a carrier. This carrier, about six feet square, contained two motors with cogwheels attached, by force of which it conveyed buckets of cinders suspended below from a point above the cinder pit to a point across the tracks over cars into which they were emptied. The cinders were thence carried away in cars for ballast and for fills in the road and in the yard. The plaintiff was a night electrician; his duty being to repair motors, lights, and other electrical appliances. Having received a report that the motor in the cinder hoist or carrier was out of order, plaintiff, with one Browning, a foreman, did the repair work on the night of October 22, 1916. After

finishing the work, plaintiff sent Browning to the house from which the current was controlled, directing him to turn on the current, so that he could discern whether the motors would operate successfully. The plaintiff remained standing in or on the carrier. The motor responded suddenly when the current was applied by Browning, causing plaintiff to lose his balance, and, in the effort to recover himself, to put his foot involuntarily into the unprotected gearing, by which it was crushed.

On the issue of defendant's negligence, the plaintiff's testimony was to this effect: The controller in a house at the end of the transverse track had been originally provided with nine fingers, by the use of which the motor could have been started so gradually that there would have been no substantial danger in standing in the carrier to observe the working of the motor; but at the time of the accident three or four fingers were off, and the absence of these caused the motor to start very suddenly when the current was applied. Electric lights had been provided, under which the carrier could have been run, so that the working of the motor could have been observed; but these lights had failed, and were not in use at the time. Because of their absence, plaintiff was obliged to hold a torch in one hand in order to make the repairs. Had the hand in which he held the torch been free, he would have been able to catch and restore his balance without putting his foot in the gear. The cogwheels by which the carrier was run when the current was turned on were not guarded. Some time before the accident the head electrician, in response to complaints of the plaintiff, had promised to supply the lights, to repair the controller, and to place guards for the gearing.

[1] The most forcible contention against plaintiff's case is that the carrier was not constructed with the view that any employé would stand in it while it was moving; that there was no reason for O'Dell to do so, and therefore it could not be lack of due care not to guard the cogs or to use a framework insecure by reason of vibration, or a controller which started the motor very suddenly because out of repair, or to provide better lights to protect plaintiff while standing in the carrier—a use of the carrier never contemplated by either employer or employé. In support of this contention, it was insisted in argument that plaintiff admitted that he could have stood outside and observed whether the motor was running as it should, and what the defect, if any, was.

As it seems to us, the plaintiff's testimony does not admit of this construction. He says:

"I told Browning to go and start up the motor. I repaired it, and told him to start it up. My left foot was on this shaft box. My business required me to keep it there, bring my right foot around to this flat plate, and then squat down, so that I could see the head of the motor, and learn whether it was operating right or not; and if it had been running all right I could have gone out of the carriage to this house, had Browning to start it up, and could have told from that house whether it was running all right or not; if it had not been running all right, I would have known that, but in the house I could not have told where the trouble was. * * * If I had left the carriage and gone over into the house, I could not have told what was wrong, if the motor had proved to be wrong. I was obliged to be inside of

the carriage in order to tell where the trouble was, if there had been trouble. The current was turned on to test it. The sockets were for 400 to 450 candle power lights. After I complained, I thought they would fix it as soon as they got a chance. I suppose they had not had a chance. If I had gone back into the house and turned on the current, in case it should have gone all right, my duty would have been completed. In case the motor did not run all right, I would have got the controller off and gone back out there. I could not tell the trouble then, so I couldn't have been nearer my trouble than I was in my house. In order to test it, I had to be there where I could see the motor. A workman has to test his work before he leaves it."

It is true that the defendant testified that he could have told whether the motor was working properly when standing outside the carrier, or even at the controller house; but the above extract from his testimony, it seems to us, meant that it was desirable, if not absolutely necessary, for the repairer of the motor to stand inside the carrier and observe the working of the machine, so as to determine where the trouble in the motor was, in case it should not work properly. True, there was testimony on behalf of the defendant that it was entirely unnecessary and dangerous to stand in or on the carrier for any purpose; but this only made an issue for the jury whether there was any good reason for plaintiff in the performance of his duty to stand in or on the carrier, and, if so, whether due care required the cogs to be guarded. Thus the evidence of the plaintiff made an issue of negligence on the part of the defendant to go to the jury; and hence the refusal to direct a verdict was proper.

There was no request for the withdrawal of any particular charge of negligence from the jury as unsupported by the testimony, nor was there any exception to the specific instructions applicable to the case which were given.

[2] The defendant was not entitled to a directed verdict on the ground that the plaintiff, having knowledge of the defect, had assumed the risk, because he testified that the defendant, in response to his complaints, had promised to remedy them. The evidence was not conclusive that the accident occurred so long after the complaint was made that the plaintiff must have abandoned all hope of performance of the promise.

[3] We are unable to hold that plaintiff was injured while engaged in interstate commerce. Without going into the intricacies of the distinctions, it is enough to say that in our opinion the case is controlled by Delaware, etc., R. R. Co. v. Yurkonis, 238 U. S. 439, 35 Sup. Ct. 902, 59 L. Ed. 1397; Chicago, etc., R. R. Co. v. Harrington, 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941; Raymond v. Chicago, etc., Ry. Co., 243 U. S. 43, 37 Sup. Ct. 268, 61 L. Ed. 583. When a case has been fairly tried on the merits, we are not inclined to reverse on refined distinctions between interstate and intrastate commerce, except upon a clear conviction that the view of the trial judge was erroneous.

[4] There is no force in the position that it was necessary to plead and prove the applicable statute of the state of North Carolina, where the accident occurred. The federal courts take judicial notice of the statutes of the states. Lamar v. Micou, 114 U. S. 218, 5 Sup. Ct. 857, 29 L. Ed. 94. We find no ground for reversal.

Affirmed.